Filed 3/11/26  P. v. Ibarra CA5

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> JUAN FRANCISCO TAPIA IBARRA, <br><br> Defendant and Appellant. | F088467 <br><br> (Super. Ct. No. CR-22-002035) <br><br><br> **OPINION** |

-----

## THE COURT[*]

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna Reeves, Judge.

Cliff Gardner, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the Attorney General, Sacramento, California, for Plaintiff and Respondent.

-ooOoo-

-----

[*]      Before Levy, Acting P. J., Detjen, J. and Harrell, J.

Appointed counsel for appellant Juan Francisco Tapia Ibarra asked this court to review the record to determine whether there are any arguable issues on appeal. (See *People v. Wende* (1979) 25 Cal.3d 436.) Counsel filed an opening brief that sets forth the facts relating to this appeal.

Appellant was advised of the right to file a supplemental brief within 30 days of the date of filing of the opening brief. More than 30 days elapsed, and we received no communication from appellant. Finding no arguable error that would result in a disposition more favorable to appellant, we affirm the judgment.

The following is a brief description of the facts and procedural history of the case. (See *People v. Kelly* (2006) 40 Cal.4th 106, 110, 124.)

## PROCEDURAL HISTORY

The District Attorney of Stanislaus County filed a second amended information on April 2, 2024, charging appellant with the murder of Zobeyda Esquerra (Pen. Code,[1] § 187, subd. (a); count I), the attempted murder of Cesar Z. (§§ 664, 187, subd. (a); count II), assault with a semiautomatic firearm (§ 245, subd. (b); count III), evading a peace officer (Veh. Code § 2800.2; count IV), robbery (§ 211; counts V, VI), stalking (§ 646.9, subd. (a); count VII), vandalism with damages over $400 (§ 594, subd. (b)(1); count VIII), and arson of a structure (§ 451, subd. (d); counts IX, X). The second amended information further alleged various circumstances in aggravation (Cal. Rules of Court, rule 4.421(a)(1), (8) & (b)(1)) as to all counts and special circumstances that appellant was lying in wait (§ 190.2, subd. (a)(15)) and personally and intentionally discharged a firearm causing great bodily injury (§ 12022.53, subd. (d)) as to count I, acted with premeditation as to counts I and II, personally and intentionally discharged a firearm (§ 12022.53, subd. (c)) as to count II, personally used a firearm (§ 12022.5, subd. (a)) as to count III, personally used a firearm (§ 12022.53, subd. (b)) as to counts V

---

[1] Undesignated statutory references are to the Penal Code.

and VI, and committed the offenses while released on bail for stalking (§ 12022.1) as to counts I through VI. He pleaded not guilty and denied all allegations.

On April 29, 2024, the jury convicted appellant of all charges, found true all enhancements (except for acting with premeditation as to count II), and found true some of the circumstances in aggravation.

The trial court sentenced appellant on July 3, 2024, to a total term of 65 years 4 months in prison to life without the possibility of parole. The court ordered appellant to pay a $300 restitution fine (§ 1202.4, subd. (b)), $400 in court operations assessments (§ 1465.8), and $300 in criminal conviction assessments (Gov. Code, § 70373).

Appellant filed a timely notice of appeal on August 8, 2024.

## FACTUAL SUMMARY

Twenty-two-year-old Zobeyda Esquerra worked at an automotive store with appellant and Cesar Z., who was hired in July or August 2021. All three individuals attended the same high school. Appellant was Esquerra's supervisor at work but believed that Esquerra had romantic feelings for him. They interacted outside of work and socialized between March and fall of 2021. Appellant said that they were in love and slept together, but she slept with other people and moved on from him. Esquerra's sister, C.V., testified that she heard a phone conversation between Esquerra and appellant in which appellant acknowledged they were just friends.

In July or August 2021, Esquerra became afraid of appellant after someone commenced a series of events that included banging on and breaking Esquerra's apartment windows. As a result of these events, Esquerra and C.V. set up three or four security cameras around Esquerra's apartment, two of which faced Esquerra's car.

Esquerra started seeing Cesar outside of work, and their relationship progressed to Cesar spending several nights a week with Esquerra at her apartment. Cesar testified that while staying over with Esquerra, someone woke them up several times by banging on the windows, but he never saw the responsible individual. On September 19 and 20,

3.

2021, someone broke the windows of Esquerra's car and threw acetone on it. Officers responded to Esquerra's apartment at approximately 1:50 a.m. on September 20, 2021, and documented the incident and damage to the car, which cost more than $1,000 to repair. C.V. testified that on September 25 and 26, 2021, appellant followed Esquerra home and shone a flashlight into Esquerra's car before returning to his car. During this time, C.V. pulled her car behind him to block him from leaving and photographed his car. C.V. testified that someone slashed the tires on Esquerra's car just as Esquerra started a relationship with Cesar and described someone scratching the paint on Esquerra's car.

On October 4, 2021, someone threw a flare into Esquerra's car and set it on fire. Esquerra reported her fears and showed text messages that she had received from appellant to police officers on October 8, 2021.

Esquerra's mother and father testified that they loaned their car to Esquerra for one week after Esquerra's car was set on fire. In the early morning hours of October 9, 2021, after Esquerra had returned the car to her parents, a neighbor came to the parent's door, told them that their car was on fire, and helped to put the fire out. Police responded.

Later that same day, C.V. visited Esquerra at work and greeted Cesar using the term "brother-in-law." Appellant reacted with anger and slammed his hand on a desk. When she left, C.V. parked across the street to see if Esquerra would be followed. Esquerra left with Cesar, and appellant followed them to Esquerra's apartment. He parked, turned off his lights, and drove away for a few blocks. C.V. and a friend followed appellant, and the friend parked next to appellant. Appellant gave them permission to search his car and wallet. They found a receipt for binoculars, notes containing the license plate numbers of the mother's car and another car driven by Esquerra that evening, and a paper containing the password for surveillance cameras at the automotive store with a notation of the retention period for the surveillance camera recordings.

Livingston Police Officer Thomas Griffin responded to the location and questioned appellant. Griffin recognized appellant's car in a video of the October 9, 2021

arson from a neighbor's surveillance camera. Appellant told Griffin that he was Esquerra's coworker and had been in a sexual relationship with her that ended three months previously. Appellant claimed that he had been following Esquerra because unidentified individuals were forcing him to do so. Griffin arrested appellant for stalking. Appellant agreed to speak with Griffin further and admitted that he was in love with Esquerra, had purchased flares from a store previously, was forced to commit the arson on Esquerra's car, and had given her $5,000 towards repairing it. Appellant told Griffin that he wrote down the information about Esquerra found on the paperwork because the other individuals wanted him to do so. Appellant was released on bail the following day and was still on bail when he killed Esquerra on March 8, 2022.

C.V. helped Esquerra obtain a restraining order against appellant. On October 11, 2021, Livingston Police Officer Nicolas Kirk served the restraining order on appellant. Chief of Police John Ramirez testified that he contacted appellant on October 12, 2021, to ask some follow-up questions. During the conversation, appellant admitted that he threw flares into both cars to burn them because he was angry with Esquerra. Regarding the damage to Esquerra's car on September 20, 2021, appellant initially denied involvement but eventually admitted that he used acetone to damage her car. Appellant drafted an apology letter to Esquerra at Ramirez's request.

Appellant was suspended from work after his October 9, 2021 arrest. Per company policy, someone charged with a crime has 42 days to clear up the charges or they are dismissed until they do so. Appellant was later terminated on November 29, 2021.

Esquerra began getting panic attacks because she was frightened of appellant. Esquerra worked as a delivery driver at the automotive store, and one day, she returned from a delivery scared and crying because appellant had been following her. She left work early to report it to police and seek a restraining order.

5.

Esquerra had another panic attack on October 27, 2021, after appellant followed her, passed her, and then stepped on his brakes repeatedly while she made a delivery. She called work in a panic, and the employee who answered the call instructed her to pull over and then went to her location. When he arrived, the employee observed that Esquerra was hyperventilating and shaking. He called an ambulance and the police. Officer Kirk responded to the call and saw Esquerra having a panic attack and being assisted by paramedics. Chief Ramirez spoke with Esquerra after that, on November 4, 2021. She seemed stressed, worried, and scared and was visibly shaking at times.

Cesar moved in with Esquerra in mid-November 2021. While she and Cesar initially worked in the same store, Cesar was transferred to a different store per company policy because of their relationship. Esquerra was fired in December 2021 after she stopped going to work because she was frightened by what had been happening to her. She later found a job and borrowed Cesar's car to drive to work. She regularly took Cesar to work and, since he worked the closing shift, would park in the same area of the parking lot while waiting for him to finish work.

One of appellant's coworkers testified that appellant discussed what he had done to Esquerra and described his attempts to hide his identity by wearing different clothes and boots. Appellant also told the coworker that appellant had cut his arm when he bashed in Esquerra's window. Appellant explained his conduct by saying, "[Y]ou can only push a nice guy so far." Another coworker testified that he exchanged text messages with appellant in which appellant would ask him questions about Esquerra's employment activities. Appellant expressed his belief that it was unfair that he lost his job while Esquerra still worked there.

U.B., appellant's coworker, testified that appellant told her that he wanted a relationship with Esquerra, but Esquerra was not sure she wanted a relationship. Appellant also tried to check the store cameras concerning a robbery that happened a few days previously but was really checking up on Esquerra and Cesar. U.B. recorded a

conversation with appellant that occurred shortly after appellant's arrest. Appellant admitted that he caused his friends to knock loudly on Esquerra's door, took the valve stems from her car tires, scratched her car, and put acetone and battery acid on her car. He also admitted that he broke the window of her car and threw a flare inside and did the same to her mother's car. He stated that he had fun doing these things to Esquerra and started to feel at peace. He claimed that he ended his relationship with Esquerra officially when heard people saying that Esquerra and Cesar were sleeping together. U.B. told appellant that Esquerra thought of him as a friend, but he wanted something more out of the relationship. Another store employee testified that after appellant was arrested, he admitted setting Esquerra's mother's car on fire and knocking on Esquerra's apartment windows.

On February 18, 2022, appellant entered another location of the automotive store at closing time. While armed with a gun, he ordered the two employees working to open the safe, grab a trash bag, and give him the money.

On March 8, 2022, appellant arrived near the automotive store where Cesar was working at approximately 8:37 p.m., according to the surveillance video. Approximately five minutes later, Esquerra arrived at the automotive store and parked. Cesar and Abigail G. were closing the automotive store while Esquerra waited for Cesar in the parking lot. At approximately 8:59 p.m., appellant arrived in the parking lot of the automotive store, pulled in behind Esquerra's car, which blocked her from leaving, and got out of his car. Esquerra called Cesar while he was locking the front door; she was frantic and yelling. Hearing Esquerra scream his name and gunshots, Cesar ran out the front door and saw a car parked behind his car and an individual dressed in black pointing a firearm at his car. Another individual who witnessed the shooting from a nearby store testified that the shooter parked behind Esquerra's car, got out and shot at Esquerra as she got out of the passenger seat. The shooter then walked to Esquerra, shot her five more times, and fired two shots at the store before leaving. Cesar yelled out when he saw

Esquerra being shot, and that's when the shooter pointed the firearm at Esquerra and fired twice. Cesar and Abigail ran to the back door and saw a light-colored sedan leaving while they ran to Esquerra, who was unresponsive on the ground. Esquerra was pronounced dead at the hospital. She died of multiple gunshot wounds.

Other witnesses described the shooter's car to police officers. Officers chased the car as it ran red lights and drove at unsafe speeds before it collided with a fence running between two residences. Officers eventually arrested appellant after they found him hiding in a bush. Appellant said, "I'm sorry," as he was taken into custody. Officers seized a recently fired gun from appellant's car, as well as binoculars, latex gloves, and a cell phone. Appellant said as he was transported, "If you guys hadn't caught me, this would have been a cold case."

Appellant agreed to speak to detectives after his arrest and initially claimed to have been in the area of his arrest because he was jogging and walking. Eventually, appellant admitted that he hurt someone and was a bad guy. He claimed that had gone to the location to kill Cesar and Esquerra had gotten in the way. Appellant explained that the murder "was premeditated," as he had planned to kill Cesar so that the murder would not be connected to appellant. He described months of planning to make the murder appear as a robbery, which included the following actions: (1) wearing a thick jacket to disguise his stature; (2) purchasing and using a car that was not in his name and could not be traced to him; (3) obtaining a burner phone to avoid creating GPS location information that could be traced to him; (4) purchasing and using a gun so he would not leave DNA; (5) bleaching his bullets to not leave DNA; (6) leaving his own car at a different location and using the car not registered to him; and (7) driving to the automotive store to scope out driving routes with no cameras.

While waiting for the store to close, appellant saw Cesar's car pull into the parking lot and assumed Esquerra was driving because he knew they shared the car. He waited for five minutes as he thought and debated whether to kill her. He then parked his car

8.

behind her to box her in so that she could not leave. According to appellant, he was already there and so he might as well end it because "[s]he was placed there for a fucking reason." Appellant then fired 10 rounds, including the shots at Cesar and Abigail. Appellant also described three other plans he had considered that included killing Esquerra.

The prosecution presented evidence of statements appellant made to individuals from the jail after the murder. For example, in March 2022, appellant told his mother, "They got me with everything" and "I did what I did. Fuck it." That same month, he told his sister, "[M]ission complete." Appellant also described that Esquerra "screamed like a pig … when she looked and got shot." He told another individual that Esquerra believed that she could "screw every man on her way" and was "arrogant" and "overconfident" but learned "if you pinch the chicken, well when she gets mad," "it will pinch you back." Appellant told his father, "Simply, the thing is, dad, if she hadn't slept with that man, none of this would have happened." Appellant described during another March 2022 call, "I fucked her up" and "got everything back."

Appellant testified at trial consistent with his statement to police and described that he had a sexual relationship with Esquerra that ended shortly after Cesar commenced working at the automotive store in August 2021. Appellant confronted Esquerra about her relationship with Cesar on October 7 or 8, 2021, and appellant considered their relationship over thereafter. Appellant admitted that he burned Esquerra's car before the confrontation because he believed Esquerra was seeing Cesar behind his back.

After appellant visited the automotive store in December 2021, Cesar reported to police that appellant had visited the store to look for Esquerra, although appellant denied that he had been looking for her. Appellant wanted to kill Cesar for reporting him to the police, losing his career, losing Esquerra, losing his reputation, and bullying that he claimed occurred during high school. He started planning to do so in January 2022, after purchasing a firearm in December 2021. Appellant testified to his preparations to kill

9.

Cesar and his belief the automotive store would be the perfect place to stage a robbery that would result in Cesar's death. Appellant admitted that he had committed a robbery the month prior to the murder at another automotive store so that police would think the murder was committed by the same robber. He also described how he killed Esquerra and shot at Cesar.

Having undertaken an examination of the entire record, we find no evidence of ineffective assistance of counsel or any other arguable error that would result in a disposition more favorable to appellant.

## **<u>DISPOSITION</u>**

The judgment is affirmed.